IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 17-cv-1327-WJM-KMT

JUANITA MCBETH,

    Plaintiff,

v.

PHYSICIAN HEALTH PARTNERS, INC., d/b/a Correctional Health Partners, and
DANIEL FITZGERALD,

    Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' SUMMARY JUDGMENT MOTION, AND GRANTING DEFENDANTS' RULE 702 MOTION

Plaintiff Juanita McBeth broke her arm when she fell onto a concrete floor at the Pueblo County Detention Center. She claims that Defendant Daniel Fitzgerald, an EMT at the Detention Center, was deliberately indifferent to her medical needs, needlessly leaving her in pain overnight. She therefore sues Fitzgerald for violation of her Fourteenth Amendment Due Process right to adequate medical care in pretrial detention. She also sues Fitzgerald, together with his employer, Physician Health Partners, Inc. (collectively, "Defendants"), for medical malpractice.[1]

Currently before the Court are two motions: Defendants' Motion for Summary Judgment ("Summary Judgment Motion") (ECF No. 88), and Defendants' Motion to exclude Plaintiff's Expert Witness Christa A. Bakos, R.N. ("Rule 702 Motion") (ECF

---

[1] McBeth previously asserted a claim against Physician Health Partners for entity liability under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), but she has since elected to abandon that claim. (*See* ECF No. 103 at 2 n.1.)

No. 92). For the reasons explained below, the Court denies the Summary Judgment Motion as to McBeth's deliberate indifference claim, but grants it as to McBeth's medical malpractice claim. As for the Rule 702 Motion, it is granted because McBeth's expert's testimony is largely irrelevant if there is no longer a medical malpractice claim for the jury to decide, and it is otherwise improper expert testimony.

## I. SUMMARY JUDGMENT ANALYSIS

### A. Legal Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

### B. Facts

The following facts are undisputed unless attributed to a party, or otherwise

noted.[2]

On the evening of June 1, 2016, police officers arrested McBeth—apparently for driving while intoxicated—and booked her into the Pueblo County Detention Center. (ECF No. 25 ¶¶ 15–16; ECF No. 88 at 3, ¶ 3; ECF No. 103 at 2, ¶ 3.) McBeth made comments that the arresting officer interpreted as an expression of suicidal intent, so she was taken to a changing cell where she would be required, for her own protection, to remove her clothing and instead wear only a smock. (ECF No. 88 at 3, ¶ 6.)

On duty at the Detention Center that night was Defendant Fitzgerald, an EMT employed by Physician Health Partners, which provides medical services at the Detention Center under a contract with Pueblo County, Colorado. (*Id.* ¶¶ 1–3.) When detention officers took McBeth to the changing cell, Fitzgerald was nearby, but outside of the cell. (*Id.* at 4, ¶ 7.)

The summary judgment record does not state whether McBeth voluntarily removed her clothes or if detention officers forcibly removed them.[3] At some point, however, she was standing naked in the corner of the changing cell, facing the wall, and struggling against detention officers' attempts to control her. That is where a Detention

---

[2] The undersigned's Revised Practice Standard III.E.3 requires summary judgment movants to include a "Statement of Material Facts" in separately numbered paragraphs, with citations to supporting evidence. Defendants included the required statement in their motion. (ECF No. 88 at 3–8.) Revised Practice Standard III.E.4 requires summary judgment respondents to specifically admit or deny the movant's factual assertions. McBeth did not follow that practice standard. Instead, she set forth a competing statement of material facts, without specifically addressing Defendants' statement. (ECF No. 103 at 2–8.) The Court could therefore deem McBeth to have admitted Defendants' statements of fact. However, reading the two statements together, the relevant areas of factual agreement and disagreement are obvious. Therefore, in the interest of justice, the Court will excuse McBeth's failure to follow the undersigned's Revised Practice Standards.

[3] McBeth's complaint alleges that her clothes were forcibly removed (ECF No. 25 ¶¶ 28–31), but she makes no such claim in her summary judgment briefing.

3

Center video (Defendants' Exhibit E, *see* ECF No. 94) begins. The video, which has no audio, depicts two detention officers holding McBeth by her arms and struggling to control her, with a third detention officer holding a smock and seemingly looking for an opportunity to place it on McBeth. A fourth officer stands behind the rest of them, pointing a taser at McBeth's back. The struggle lasts for about twenty seconds, after which the officer with the smock moves out of the way and the officers attempting to control McBeth by her arms step to the side, giving the officer with the taser a clear shot. That officer discharges his taser, with the two prongs striking McBeth on the left side of her back. McBeth immediately falls backward and the officers on either side of her let go of her arms. McBeth does nothing to break her own fall and so her back, elbows, and head strike the concrete floor with an appreciable amount of force.

Fitzgerald, still outside the cell, heard the commotion and an officer's announcement that a taser would be fired. (ECF No. 88 at 4, ¶ 9.) By the time the taser was fired, Fitzgerald was in a position to see inside the changing cell because he "saw Ms. McBeth fall to the ground, striking her [left] arm on the ground." (*Id.*)

The video shows that, soon after hitting the ground, McBeth puts her right hand to her forehead in a gesture reminiscent of having a terrible headache. One of the officers soon grabs McBeth's right arm and pulls it away from her forehead and across her body, rolling her onto her stomach. The same officer then removes the taser prongs from McBeth's back.

At this point, Fitzgerald enters the video. He kneels next to McBeth's right hip and examines her back, where the taser prongs had been. Although not clear in the video due to the positions of the detention officers relative to the camera, he also

4

assessed that McBeth's "pulse was normal, and she had good capillary refill, including in [her left arm]. Ms. McBeth was also able to acknowledge the sensation in her injured arm." (ECF No. 88 at 4, ¶ 10.)[4] Fitzgerald further says that McBeth "did not have any obvious signs of broken bones or other injuries." (*Id.*) McBeth's expert claims, to the contrary, that the video shows "visible bruising on Ms. McBeth's left arm." (ECF No. 103 at 7, ¶ 24; ECF No. 92-1 at 7.)

Fitzgerald's examination took approximately 13–15 seconds, during which he concluded that McBeth had suffered no significant injuries. (ECF No. 103 at 3, ¶ 7; Defendants' Exhibit E.) The video then shows him exiting the changing cell, after which a detention officer places the smock over McBeth like a blanket. One detention officer appears to be asking something of McBeth, but McBeth waives that officer away with her right arm. All of the officers then exit the picture (and presumably the cell). The video ends with McBeth, still on her stomach, propping herself up with her right arm and looking at her left arm, which is in a somewhat unnatural position, although it is not visibly injured.

The record does not state whether Fitzgerald observed McBeth in this position. But at some point soon after his interaction with McBeth, Fitzgerald "contacted Nurse Brandi Atencio to relay his observations of Ms. McBeth, and he was instructed [that] no further care was needed for Ms. McBeth unless something about her condition changed." (ECF No. 88 at 5, ¶ 13.)

---

[4] McBeth may mean to dispute Fitzgerald's account of his examination when she alleges that she has no memory of it. (ECF No. 103 at 3, ¶ 9.) But lack of memory, by itself, does not create a genuine dispute of fact. *See* Fed. R. Civ. P. 56(c)(1). Nor does McBeth point to any evidence that might persuade the jury that Fitzgerald's report is untrue in this regard. The Court therefore deems Fitzgerald's account of McBeth's pulse, capillary refill, and ability to acknowledge sensation as undisputed for summary judgment purposes.

5

McBeth spent the night in the changing cell.  (*Id.* ¶ 14; ECF No. 103 at 4, ¶ 10.)  According to Fitzgerald, he "periodically checked on Ms. McBeth by observing her in the cell sleeping with no apparent signs of distress."  (ECF No. 88 at 5, ¶ 14.)  But McBeth says that she repeatedly called out through the night "that she needed medical attention and that her arm was in pain," but to no avail.  (ECF No. 103 at 4, ¶ 10.)

Fitzgerald conducted McBeth's "Receiving Screening" the following morning (June 2, 2016) at 5:49 AM.  (ECF No. 88 at 5, ¶ 15.)  He had tried to conduct that screening the previous evening (before the incident in the changing cell) but could not due to McBeth's intoxication and refusal to cooperate.  (*Id.* at 3, 5, ¶¶ 4, 15.)  According to Fitzgerald, McBeth complained of "arm pain" during the June 2 Receiving Screening.  (*Id.* at 5, ¶ 16.)  But, says Fitzgerald, "Ms. McBeth's vital signs, including her pulse and the capillary refill in her arm, and both were still normal.  Ms. McBeth's sensory motor sensation was also normal.  There was bruising, but no signs of fracture."  (*Id.* (citations omitted).)

McBeth tells a different story of the Receiving Screening.  She says that she specifically complained of a broken arm, not just arm pain, and that she was using her right arm to hold up her left arm, because she could not lift the latter. (ECF No. 103 at 4–5, ¶¶ 12–13.)  Fitzgerald "told her to move her fingers; when she complied, Defendant Fitzgerald told her she was 'fine.' . . . Fitzgerald told her that, when he had broken his arm in the past, he could not move his fingers."  (*Id.* ¶ 13 (citation omitted).)  As for Fitzgerald's claims about checking vital signs such as pulse and capillary refill, McBeth asserts that "Fitzgerald never physically examined her, merely visually inspected her arm."  (*Id.*)

6

Fitzgerald's shift ended at 7:00 AM that morning. (ECF No. 88 at 5, ¶ 17.) "He advised Randy Allen, the EMT who came on shift after him, about the incident involving Ms. McBeth." (*Id.*)

McBeth apparently appeared in court that morning because deputies escorting her from the courthouse back to the Detention Center noticed that she was in significant pain. (ECF No. 103 at 5, ¶¶ 14–16.) A sergeant then arranged for photographs to be taken of McBeth's injuries. (*Id.* ¶ 17.) Those photos show significant bruising on McBeth's left arm and possibly a deformity—something consistent with a fractured bone poking from under the skin. (ECF No. 103-3.)

At 9:50 AM, after the photos were taken, EMT Allen examined McBeth. (ECF No. 103 at 5, ¶ 18.) His treatment note for that examination reads:

> Upon arrival for AM shift was told about [patient] who had been uncooperative and was tazed and taken to the ground. Was told problem had already been addressed. But when I checked [her] she was still complaining of upper left arm pain. When I examined [her] arm there was significant swelling and bruising to [the] area. But no obvious deformity noted. [She] had good pulses/sensation and cap refill. [She] was able [to] move arm with limited range of motion due to pain 9/10. Was informed [that she] was set to be released [on personal recognizance bond] and would be sent to hospital soon for clearance from [suicide] precautions and would have her arm looked at, at that time.

(ECF No. 88-6.)

McBeth was indeed transported to Parkview Medical Center in Pueblo later that morning. (ECF No. 88 at 7, ¶ 27; ECF No. 90-3 at 1.) Parkview personnel took x-rays and diagnosed a "left distal humerus fracture closed, comminuted [*i.e.*, the bone had fractured into more than two fragments]." (*Id.* at 4.)

At 7:16 PM that evening, a physician back at the Pueblo County Detention

7

Center entered a note in McBeth's chart summarizing her case and stating, among other things, that McBeth "shows possible deformity to left upper arm," with "[s]welling to elbow and biceps area . . . possible fracture to left arm . . . to be taken to parkview for medical and mental health clearance, then released." (ECF No. 103-4.) It is unclear what prompted the physician to enter this note. It is also unclear where he obtained his information or why he wrote in the present tense. All other information in the record shows that McBeth was transported to Parkview Medical Center about nine hours before the note was written, and nothing indicates that she returned to the Detention Center afterwards.

In the days following her injury, McBeth had surgery to fix the broken bone. (ECF No. 88 at 8, ¶ 29.) She continues to complain of "decreased range of motion in her left elbow, forearm, and wrist, as well as weakness, numbness, and swelling of her left arm." (*Id.* ¶ 30.) And she complains of "continu[ing] to experience severe, radiating pain from her elbow." (*Id.*)

## C. Denial of Medical Care in Violation of the Fourteenth Amendment

State officials violate a pretrial detainee's Fourteenth Amendment Due Process rights "when they are deliberately indifferent to an inmate's [objectively] serious medical needs." *Lopez v. LeMaster*, 172 F.3d 756, 764 (10th Cir. 1999) (internal quotation marks omitted).[5] McBeth argues that Fitzgerald exhibited such deliberate indifference

---

[5] The Tenth Circuit applies the same test for deliberate indifference to serious medical needs to both Eighth Amendment claims brought by prisoners and Fourteenth Amendment claims brought by pretrial detainees. *See, e.g.*, *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002). In *Estate of Vallina v. County of Teller Sheriff's Office*, 757 F. App'x 643, 646–47 (10th Cir. 2018), the Tenth Circuit noted a developing circuit split regarding whether a recent Supreme Court decision abrogating the subjective component in a pretrial detention use-of-force claim also calls for abrogating the subjective component in a pretrial detention denial-of-medical-care claim. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). But the plaintiff in *Estate of Vallina* did not argue for such

8

on the night of June 1, 2016, into the next morning. (ECF No. 103 at 10–12.)

An objectively serious medical need is one that has "been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014) (internal quotation marks omitted). And a state official (or one working on the state's behalf, as Fitzgerald was here) is deliberately indifferent to such a need when the official "knows of and disregards [the medical need]; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

McBeth's claim against Fitzgerald falls into a subset of deliberate indifference claims having to do with delay of medical care. When a plaintiff alleges delay, the objective element of the cause of action requires "substantial harm," meaning that the delay was objectively likely to lead to "lifelong handicap, permanent loss, or considerable pain." *Al-Turki*, 762 F.3d at 1193.

Here, Fitzgerald offers no evidence that McBeth broke her left arm at some time *other than* when she struck the concrete floor after being tased. In addition, Fitzgerald does not argue that a broken arm is not an objectively serious medical need. Finally, Fitzgerald does not argue that a broken arm would not cause considerable pain. Accordingly, a reasonable jury could find the objective element satisfied.[6]

---

abrogation, so the Tenth Circuit continued to follow its prior precedent. *See* 757 F. App'x at 647. Likewise, McBeth does not argue for such abrogation, so the Court will continue to apply the Eighth Amendment standard.

[6] McBeth does not claim that her injury worsened overnight, such that Fitzgerald should be responsible for the costs of her surgery and subsequent care. She claims only that she

—

As for the subjective element, McBeth has presented sufficient evidence that, if believed by a jury, would support a finding that Fitzgerald recognized and nonetheless ignored McBeth's considerable pain and the possibility of a serious injury. Fitzgerald witnessed McBeth's unprotected fall onto the concrete floor of the changing cell. He also knew he had examined her only briefly, and only to a limited extent, within seconds of that fall.[7] It is well within a lay jury's competence to understand that the signs of internal injuries will often not manifest themselves externally in the first few seconds after the injury is incurred. Next, McBeth alleges that she cried out through the night, requesting help due to pain, but received no help. McBeth also alleges that Fitzgerald reacted to her complaints the next morning with a flippant attitude.

Fitzgerald, of course, tells a different story. But if the jury believes McBeth's story, it would be enough to infer deliberate indifference to McBeth's considerable pain when the possibility of a severe injury would have been readily apparent. *Cf. Al-Turki*, 762 F.3d at 1194 (nurse could be held liable for deliberate indifference when she knew of and ignored inmate's severe abdominal pain and vomiting, even when it turned out only to be kidney stones).

Fitzgerald argues that McBeth is simply questioning his medical judgment, which is not actionable under a deliberate indifference claim. (ECF No. 88 at 12.) *See also Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) ("[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises

---

suffered needless pain due to the delay in care. (*See also* Part II.B, below.)

[7] The parties' dispute whether Fitzgerald could have been deliberately indifferent in his 13–15 second examination immediately following the taser incident. Given the totality of the evidence, the Court need not decide whether that episode, in isolation, might support a finding of deliberate indifference.

his considered medical judgment. Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing."). But Fitzgerald's medical judgment, if that is the proper term for it, was that McBeth "did not have any significant injuries" that he could perceive in the first few seconds after her fall. (ECF No. 88 at 4, ¶ 10.) Even assuming that was a reasonable initial medical judgment under the circumstances, he then—from McBeth's perspective—ignored her cries for help throughout the night and made only a cursory attempt to reevaluate her in the morning, despite her report that she had broken her left arm and that she was carrying her left arm with her right because she could not lift her left arm independently. Such a circumstance is far afield from a dispute over the proper course of treatment. It is more akin to the situation where "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency." *Self*, 439 F.3d at 1232.

Fitzgerald also notes that he contacted Nurse Brandi Atencio "and she instructed him [that] no further care was needed." (ECF No. 88 at 11.) But Nurse Atencio could only give advice based on what Fitzgerald reported to her, and what Fitzgerald reported to her was only what he learned in a rapid examination that took place soon after McBeth's fall. Indeed, Fitzgerald's testimony is that Nurse Atencio "instructed [that] no further care was needed for Ms. McBeth unless something about her condition changed." (*Id.* at 5, ¶ 13.) If the jury believes McBeth's version of events, Fitzgerald's knowledge of McBeth's condition changed overnight and into the morning.

For the foregoing reasons, the Court will deny summary judgment on McBeth's claim against Fitzgerald for deliberate indifference.

11

### D. Medical Malpractice

McBeth also brings a common-law professional negligence (medical malpractice) claim against Defendants—against Fitzgerald directly and against Physician Health Partners under a *respondeat superior* theory. Defendants argue that this claim must fail because McBeth never filed the certificate of review mandated by Colorado Revised Statutes § 13-20-602 when a plaintiff brings a professional negligence claim. (ECF No. 88 at 21.) McBeth responds that this was excusable neglect because it was unclear to her whether an EMT is the sort of professional against whom one must file a certificate of review. (ECF No. 103 at 13–14.)

The Court could hold that Defendants waived their certificate-of-review argument for failing to timely raise it. *See Miller v. Rowtech, LLC*, 3 P.3d 492, 494–95 (Colo. App. 2000). But the Court need not do so, nor resolve whether McBeth's explanation entitles her to any relief. The Court instead finds that McBeth's claim fails on the merits.

As Defendants point out (in the alternative to their certificate-of-review argument), "Ms. McBeth has no admissible evidence whatsoever [that] any delay in treatment exacerbated her condition or change the ultimate outcome of her care." (ECF No. 88 at 22.) McBeth, in response, does not challenge this assertion, but instead falls back on her experience of pain: "Plaintiff alleges that the delay in treatment caused by Defendant Fitzgerald's actions caused her *unnecessary pain*, rather than an exacerbation of the fracture itself." (ECF No. 103 at 14.)

Pain alone, if "considerable," justifies a deliberate indifference claim. But McBeth does not cite—and the Court could not find—any authority holding that the difference between the pain one actually experienced and the supposedly lesser pain one would have experienced if treated more quickly is, by itself, the sort of injury compensable

12

through a medical malpractice cause of action. Accordingly, Defendants are entitled to summary judgment in their favor on this claim. And because medical malpractice is the only remaining claim asserted against Physician Health Partners, it will be entitled to final judgment in its favor at the conclusion of this case regardless of the outcome of the trial between McBeth and Fitzgerald.

## II. RULE 702 ANALYSIS

Defendants (but really just Fitzgerald, in light of the foregoing) also move under Federal Rule of Evidence 702 to exclude the expert opinion testimony McBeth's medical expert, Nurse Christa A. Bakos. (ECF No. 92.)

**A.     Legal Standard**

A district court must act as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004). Admission of expert testimony is governed by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

An expert's proposed testimony also must be shown to be relevant and otherwise admissible. *See Adamscheck v. Am. Family Mut. Ins. Co.*, 818 F.3d 576, 588 n.7 (10th Cir. 2016). To be relevant, expert testimony must "logically advance[] a material aspect

13

of the case" and be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (alteration in original).

**B.    Analysis**

Nurse Bakos offers three opinions, "[t]o a reasonable degree of nursing care," that Fitzgerald violated "healthcare best practice[s]," "standards of care," and "institut[ional] protocols" when he allegedly did not assess McBeth properly immediately after the fall, did not reliably document her condition, and did not follow his employer's protocols. (ECF No. 92-1 at 13.)[8]  As the quoted language reveals, Nurse Bakos's opinions are directed at the medical malpractice claim. The Court has ruled, above, that the forthcoming trial will not include the medical malpractice claim. Medical malpractice claims and deliberate indifference claims do not overlap. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Accordingly, the Court finds that Nurse Bakos's expert opinions about the standard of care—which make up the bulk of her report—are no longer relevant, and are therefore inadmissible.[9]

---

[8] The cited page contains what is represented to be a fourth opinion, but it is really a one-sentence summary of her three preceding opinions. (*See id.*)

[9] At least in some circumstances, evidence about failure to follow the standard of care could conceivably be proper circumstantial evidence tending to support a finding that the defendant had a deliberately indifferent state of mind. *Cf. Self*, 439 F.3d at 1232 (stating in dicta that "an extraordinary degree of neglect" might support a finding of deliberate indifference in a case regarding exercise of medical judgment). But, although Fitzgerald challenges Nurse Bakos's opinions as irrelevant to deliberate indifference (*see* ECF No. 92 at 8 ("[A]ny purported failure on the part of Mr. Fitzgerald to properly document and assess Ms. McBeth's injuries has absolutely no bearing on whether Mr. Fitzgerald knew Ms. McBeth faced a substantial risk of harm and disregarded the risk with a sufficiently culpable state of mind.")), McBeth makes no argument that Fitzgerald's compliance or noncompliance with the standard of care is circumstantially relevant to his state of mind (*see* ECF No. 102 at 9–10). The Court therefore will not address this possibility.

The Court also agrees with Fitzgerald that Nurse Bakos's factual conclusions, on which she based her opinions, are improper expert testimony. (*See* ECF No. 92 at 6–8.) In particular, Nurse Bakos asserts:

- "EMT Daniel Fitzgerald's lack of assessment immediately after the taser deployment failed to determine that Juanita McBeth sustained a serious injury to [her] left arm." (ECF No. 92-1 at 7.) But it is undisputed that Fitzgerald detected no serious injury.

- "Visible bruising can be seen on the video at that time," referring to the moments immediately after McBeth fell to the concrete floor. (*Id.*) The Court has viewed the video repeatedly and has not seen what Nurse Bakos sees, with the possible exception of an area on McBeth's left bicep slightly above the elbow—visible very briefly, and less than a second after she strikes the ground—that one might view as discolored if one were specifically looking for evidence of discoloration. (*See* Defendants' Exhibit E at timestamp 21:08:06:012.) Assuming this is a bruise, it seems far more likely that it was caused by the detention officers manipulating her by her arms before her fall, rather than a bruise that developed in less than a second after a bone fracture. Regardless, Nurse Bakos does not claim that her training *as an expert* permits her to see the bruising, much less that Fitzgerald should have seen the bruising in light of his specialized training. Nurse Bakos claims that the bruising "can be seen" in the somewhat pixelated 3-frames-per-second jail-cell surveillance video taken by a camera that appears to have been mounted 8–10 feet away from

15

where McBeth hit the floor. If bruising is matter-of-factly visible in those circumstances, as Nurse Bakos claims, then it is something a lay jury needs no assistance to recognize.

- "[K]nowing that Juanita McBeth was on suicide watch, documentation reflects that EMT Daniel Fitzgerald failed to assess her throughout the night." (ECF No. 92-1 at 7.) Nurse Bakos makes many other similar failure-to-document claims. (*Id.* at 10–11.) If documentation fails to support Fitzgerald's claim that he checked on McBeth throughout the night and saw her sleeping peacefully, that is a matter for cross-examination of Fitzgerald. Nurse Bakos's (apparent) opinion that the lack of documentation means that Fitzgerald did not check up on her is a credibility judgment. And if he generally failed to document observations he was supposed to document, that is a matter for cross-examination.

- "[Fitzgerald's] written assessment at 05:49 a.m. was not consistent with [McBeth's] medical status at the time. This is evidenced by his failure to document the presence of pain, bruising and trauma." (*Id.* at 7.) This assumes that there was something to document, which turns on whose side of the story the jury believes about McBeth's condition in the early morning after the tasing incident.

- "[T]he documentation of EMT Daniel Fitzgerald on June 2, 2016 at 05:49 a.m. does not support [his response to interrogatories] written approximately 2 years after the incident." (*Id.*) This is an interpretation of the evidence and a matter for cross-examination of Fitzgerald.

16

- "EMT Daniel Fitzgerald failed to follow protocols [about taser deployment and musculoskeletal pain] established and implemented by his employer, Correctional Health Partners." (*Id.* at 12.) This is a matter for cross-examination.

Expert testimony may not be used as a guise for putting a party's interpretation of the facts before a jury. *See, e.g.*, *United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1252 (D.N.M. 2015) ("When the expert opines on the basis of 'expertise' rooted in the facts of the case being tried, [the expert] is effectively arguing the case as a mouthpiece for counsel."). Furthermore, "[e]xpert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact as required by Rule 702." *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001) (internal quotation marks omitted). Accordingly, Nurse Bakos may not testify as to these or other factual conclusions.

For these reasons, Defendants' Rule 702 Motion will be granted.

### III. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion for Summary Judgment (ECF No. 88) is GRANTED with respect to McBeth's claim for medical malpractice, but DENIED with respect to McBeth's claim for deliberate indifference to serious medical needs in violation of the Fourteenth Amendment;

2. Defendants' Motion to Exclude Plaintiff's Expert Witness Christa A. Bakos, R.N. (ECF No. 92) is GRANTED and Nurse Bakos's expert testimony is EXCLUDED;

17

and

3. As between Plaintiff and Defendant Fitzgerald, this matter REMAINS SET for a Final Trial Preparation Conference on August 23, 2019, at 2:30 PM, and a five-day jury trial beginning on September 9, 2019, at 8:30 AM, both in Courtroom A801.

Dated this 30th day of July, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge